**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ADRIAN ANDERSON, *et al.*, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

GENOMIC PREDICTION, INC., *et al.*,

Defendants.

Civil Action No. 26-2860 (MAS) (TJB)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Genomic Prediction, Inc. and Genomic Prediction Clinical Laboratory's (collectively, "Defendants") Motion to Dismiss (ECF No. 27) the Class Action Complaint (the "Complaint") (ECF No. 1). Plaintiffs[1] opposed (ECF No. 28), and Defendants replied (ECF No. 30). The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Local Civil Rule 78.1(b). For the reasons below, Defendants' Motion to Dismiss is granted.

[1] The individually named Plaintiffs in this class action, bringing this action individually and on behalf of all others similarly situated, include individual purchasers of Defendants' genetic testing products: (1) Adrian Anderson; (2) Amanda Malkin; and (3) Maureen Ewing (collectively, "Plaintiffs"). (*See generally* Compl., ECF No. 1.) Each Plaintiff also brings this action on behalf of a class of residents of their respective states of residence (California, Florida, and Pennsylvania). (*See id.* ¶¶ 328-30.)

# I. BACKGROUND[2]

## A. Factual Background

### *1. General Overview*

Plaintiffs, individually and on behalf of all other similarly-situated consumers nationwide and statewide (the "Class Members"), bring the present class action litigation alleging claims related to Defendants' marketing and sale of preimplantation genetic testing for aneuploidy ("PGT-A" or "PGT-A testing"). (Compl. ¶¶ 1, 331.)

Defendants' PGT-A testing, LifeView, is "marketed and sold by Defendants" to both individual consumers and clinicians as an add-on to *in vitro* fertilization ("IVF").[3] (*Id.* ¶¶ 9-10.) LifeView "purports to screen [the] embryos for chromosomal abnormalities." (*Id.*) Individuals undergoing IVF, therefore, "must decide whether to purchase PGT-A testing prior to the testing being performed." (*Id.* ¶ 12.) If an individual purchases PGT-A testing, IVF clinicians then perform a biopsy of the embryo, sending the collected cells from the embryo to Defendants' laboratory for PGT-A testing. (*Id.* ¶ 13.) The test results "purport to determine which embryos are 'euploid' or best suited for implantation and which embryos are 'aneuploid' or abnormal and not suited for implantation." (*Id.* ¶ 15.)

Plaintiffs allege that Defendants falsely and deceptively marketed their PGT-A testing "as a proven, accurate, and reliable method to decrease the chance of miscarriage and increase the chance of giving birth to a healthy baby" without disclosing that "science does not support this." (*Id.* ¶ 2.) Instead, scientific literature and studies over the past two decades support that "PGT-A

---

[2] For the purpose of considering the instant motion, the Court accepts all factual allegations in the Complaint as true. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

[3] IVF is a fertility process involving the fertilization of an egg with sperm to create embryos, which, upon reaching the blastocyst stage, are implanted to achieve pregnancy. (*Id.* ¶ 8.)

is unproven, inaccurate, and unreliable." (*Id.* ¶ 2; *see also id.* ¶¶ 78-92, 105-12, 120-21, 126-28, 132-57, 160-66, 168-94 (citing scientific studies and literature regarding PGT-A from 2005 to 2024).) These scientific studies indicate, for example, that "there is no difference between cycles utilizing PGT-A and cycles not utilizing PGT-A" and "the accuracy rating for PGT-A is significantly lower than advertised or disclosed." (*Id.* ¶ 18.) In addition, the American Society for Reproductive Medicine ("ASRM") has, on multiple occasions, opined that "the value of preimplantation genetic testing for aneuploidy (PGT-A) as a universal screening test for all patients undergoing in vitro fertilization (IVF) has not been established." (*Id.* ¶ 183; *see also id.* ¶¶ 128,197.) Defendants "were aware of the scientific studies and research concerning PGT-A, as well the limitations of same, including from major medical associations such as ASRM[.]" (*Id.* ¶ 452.)

### 2. *Defendants' Representations and Omissions*

Despite Defendants' awareness of the scientific literature undermining the value, accuracy, and reliability of PGT-A testing, Defendants have made various statements regarding the benefits of PGT-A testing. (*See generally id.*) Specifically, Defendants have stated that their PGT-A testing: (1) provides the "most advanced genetic screening available"; (2) increases pregnancy rates; (3) lowers miscarriage rates; (4) reduces the number of cycles of IVF needed; (5) reduces the number of wasted transfers; (6) increases chance of IVF success and having a healthy child; (7) leads to more euploid embryos and more embryos available for transfer; (8) increases the chances of a successful pregnancy; (9) has a lower false positive rate and false negative rate than NGS-based PGT-A testing; and (10) has a 98-99% accuracy rate. (*See id.* ¶¶ 222-301.) "Each of these claims," Plaintiffs allege, "[is] false and misleading, unsupported by scientific evidence, and [were] made while Defendant omitted and withheld material information." (*Id.* ¶ 301.)

Plaintiffs allege that Defendants "intentionally suppressed and concealed" material information from consumers "to sell more PGT-A testing and to avoid the public finding out the truth about PGT-A." (*Id.* ¶¶ 438, 459.) For example, Defendants failed to disclose that: (1) "PGT-A can cause damage to the embryo thereby preventing it from developing once transferred to the womb, and that PGT-A has the possibility of misdiagnosis" (*id.* ¶ 190); (2) "numerous scientific studies and opinions of professional organizations" have been published detailing the issues associated with PGT-A testing (*id.* ¶ 287); (3) "[c]hromosomal abnormal embryos may self-correct downstream," making "earlier biopsy results irrelevant" (*id.* ¶ 288); (4) "there is a substantial probability that an embryo may be misdiagnosed, and [that] the test results [may be] inaccurate" (*id.* ¶ 290); and (5) "false positives and false negatives [can] occur" with PGT-A testing (*id.* ¶ 293).

Plaintiffs further allege that they purchased the PGT-A testing "based upon Defendants' false and misleading statements and omissions of material information, including that [their] PGT-A testing is the most advanced genetic screening available." (*Id.* ¶¶ 306, 313, 320.) Prior to purchasing Defendants' PGT-A testing, Plaintiffs reviewed the claimed benefits of Defendants' PGT-A testing on Defendants' website and flyers. (*Id.* ¶¶ 308, 314-15, 320.) These benefits included: (1) "increas[ing] pregnancy rates; [(2)] lower[ing] miscarriage rates; [(3)] reduc[ing] the number of cycles of IVF needed . . . [and] the number of wasted transfers; [(4)] increas[ing] the chance of success . . . [and having] a healthy child . . .[;] and [(5)] [being] 98 to 99% accurate with a lower false positive and false negative rate." (*Id.* ¶¶ 306, 313, 320.) In deciding to purchase the testing, Plaintiffs relied upon Defendants' "false and misleading statements and omissions of material information." (*Id.* ¶¶ 312, 319, 326.) According to Plaintiffs, neither they nor the Class Members "could . . . have known of" the scientific literature and research indicating the

unreliability, inaccuracy, and uncertainty of PGT-A testing (*id.* ¶¶ 305, 457), and absent the "false and misleading misrepresentations and omissions," they "would not have purchased [the testing]" (*id.* ¶¶ 312, 319, 326). Plaintiffs and the Class Members, accordingly, "were harmed by paying for an unproven and unreliable test sold utilizing false statements and omissions." (*Id.* ¶ 302.)

### B. Procedural Background

On March 19, 2026, Plaintiffs filed a Class Action Complaint, asserting eleven causes of action. (*See generally* Compl., ECF No. 1.) Three of the counts are alleged on behalf of Plaintiff Anderson and the Class Members: (1) violation of the "unfair and fraudulent prong" of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("Count One") (*id.* ¶¶ 342-57); (2) violation of the "unlawful prong" of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("Count Two") (*id.* ¶¶ 358-63); and (3) violation of the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("Count Three") (*id.* ¶¶ 364-77).[4] One count is alleged as to Plaintiff Malkin and the Florida subclass: violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("Count Four"). (*Id.* ¶¶ 378-89.) One count is alleged as to Plaintiff Ewing and the Pennsylvania subclass: violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§201-1, *et seq.* ("Count Five"). (*Id.* ¶¶ 390-97.) Three counts are alleged as to Plaintiffs and the nationwide and statewide classes under the laws of all fifty states and the District of Columbia: (1) breach of the implied warranty of merchantability ("Count Six") (*id.* ¶¶ 398-405); (2) breach of the implied warranty of usability ("Count Seven") (*id.* ¶¶ 406-16); and (3) breach of express warranty ("Count Eight") (*id.* ¶¶ 417-25). The remaining counts are alleged as to Plaintiffs

[4] Defendants observe that these Counts, as pled, may reflect "an inadvertent error, because no claims are brought on behalf of the California Class and the 'Class' includes non-California plaintiffs." (Defs.' Moving Br. 12 n.7.)

and the Class Members: (1) fraud ("Count Nine") (*id.* ¶¶ 426-34); (2) fraudulent concealment and omission ("Count Ten") (*id.* ¶¶ 435-63); and (3) unjust enrichment and restitution ("Count Eleven") (*id.* ¶¶ 464-72).[5]

Defendants moved to dismiss the Complaint in its entirety on June 30, 2026. (*See generally* Defs.' Mot. to Dismiss, ECF No. 27.) Plaintiffs opposed on July 30, 2026 (Pls.' Opp'n Br., ECF No. 28), and Defendants replied on August 14, 2026 (Defs.' Reply Br., ECF No. 30).

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure[6] 12(b)(1), a defendant may move to dismiss a matter for want of standing "because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (citations omitted). "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). A motion to dismiss for lack of subject matter jurisdiction may either "attack the complaint on its face . . . [or] attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction." *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999). As such, a facial challenge "calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*,

---

[5] The claims brought on behalf of the nationwide class are asserted under New Jersey law. (Compl. ¶ 341.) Alternatively, "if the Court finds that New Jersey law, including all of the New Jersey law causes of action alleged below, does not apply to Plaintiffs and all Class members residing outside of New Jersey for any reason, then Plaintiffs and Class members residing outside of California assert their claims under the laws of their respective states of residence." (*Id.*)

[6] All references to "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

construing the alleged facts in favor of the nonmoving party." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). District courts considering a facial challenge, then, must construe the allegations in the complaint as true and determine whether subject matter jurisdiction exists. *Mortensen*, 549 F.2d at 891; *Cardio-Med. Assocs., Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983). "Thus, '[t]o survive a motion to dismiss [for lack of standing], a complaint must contain sufficient factual matter' that would establish standing if accepted as true." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III. **DISCUSSION**

Defendants raise multiple arguments in support of their motion to dismiss: (1) Plaintiffs lack Article III standing; (2) Plaintiffs failed to comply with pre-suit notice requirements of California, Florida, and Pennsylvania; (3) Plaintiffs fail to allege actionable misrepresentations, omissions, or reliance; (4) Plaintiffs fail to state the nationwide claims; and (5) Plaintiffs fail to state claims under the various state consumer protection laws. (*See generally* Defs.' Moving Br., ECF No. 27-1.) The Court reaches only the first argument because, as explained below, Plaintiffs lack standing.

"[T]he question of standing in the federal courts is to be considered within the framework of Article III [of the Constitution,] which restricts judicial power to 'cases' or 'controversies.'" *Twp. of Lyndhurst, N.J. v. Priceline.com Inc.*, 657 F.3d 148, 154 (3d Cir. 2011) (alterations in original) (quoting *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151 (1970)). A party invoking federal jurisdiction bears the burden of demonstrating it has standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021). If Article III standing cannot be established on the

part of the named plaintiffs, a district court "must dismiss a putative class action for lack of subject matter jurisdiction." *Finkleman v. Nat'l Football League*, 810 F.3d 187, 195 (3d Cir. 2016).

Under Article III, a plaintiff has standing if it has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The "injury in fact" inquiry is often determinative of standing. *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 205 (3d Cir. 2021). "The requirements for an injury-in-fact are well established: a plaintiff must show that [it has] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *In re Plum Baby Food Litig.*, 637 F. Supp. 3d 210, 223 (D.N.J. 2022) (quoting *Lujan*, 504 U.S. at 560).

According to Defendants, Plaintiffs lack standing to assert their economic injury theory of harm, which is their sole theory of injury because they have not alleged an economic injury-in-fact. (Defs.' Moving Br. 8-10.) Plaintiffs argue in opposition that they have Article III standing because they sufficiently "allege[d] a classic benefit-of-the-bargain injury" in that they "paid for—but did not receive—a test represented to be 98%-99% accurate and to provide specific clinical benefits, including improved reproductive outcomes." (Pls.' Opp'n Br. 15.)

"Under the benefit of the bargain theory, a plaintiff [may] successfully plead an economic injury by alleging that she bargained for a product worth a given value but received a product worth less than that value." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 283 (3d Cir. 2018). "The economic injury is calculated as the difference in value between what was bargained for and what was received." *Id.* The plaintiff, however, "must do more than simply characterize that purchasing decision as an economic injury.

The plaintiff must instead allege facts that would permit a factfinder to determine, without relying on mere conjecture, that the plaintiff failed to receive the economic benefit of her bargain." *Id.* at 281. This requires alleging that the products purchased by Plaintiffs *themselves* were defective. *Huertas v. Bayer US LLC*, 120 F.4th 1169, 1178 (3d Cir. 2024).

As Defendants note, the District of Delaware considered a motion to dismiss regarding nearly identical claims made in a PGT-A testing class action lawsuit and found that the plaintiffs lacked Article III standing. (*See* Defs.' Moving Br. 9-10); *Klosowski v. FPG Labs, LLC*, No. 24-1210, 2025 WL 2532500, at *3 (D. Del. Sep. 3, 2025).[7] There, the court read the plaintiffs' claims as asserting a "benefit-of-the-bargain theory of injury." *Id.* at *2 (quoting *Huertas*, 120 F.4th at 1174). Relying on *Johnson & Johnson*, the court found "fatal [to] the standing inquiry" that the plaintiffs failed to allege that *their own* PGT-A testing failed to "adequately perform" the intended functions. *Id.* at *3 (quoting *Johnson & Johnson*, 903 F.3d at 281).

Here, Plaintiffs' Complaint fares no better. As in *Klosowski*, Plaintiffs point to numerous studies and scientific opinions "that purport to undermine the scientific efficacy of [Defendants'] PGT-A testing and the representations" regarding reduced chances of miscarriage and increased chances of pregnancy. (*See id.*; *see also* Compl. ¶¶ 18, 141-45, 157, 176, 183-203.) The Complaint, however, does not allege facts that would enable this Court to reasonably infer that the *specific* PGT-A tests purchased by Plaintiffs were defective. (*See generally* Compl.) "None of the

---

[7] For reasons unclear to the Court, Plaintiffs' Opposition Brief did not address *Klosowski*, nor did it address the other analogous case cited by Defendants. (*See generally* Pls.' Opp'n Br.; *see also* Defs.' Moving Br. 10 (citing *Tyman v. CCRM Parent Holdings*, No. 25-1425, Order (D. Colo. June 17, 2026), ECF No. 29).) In *Tyman*, the District of Colorado dismissed the complaint for failing to plead an injury-in-fact, and in doing so, relied on *Johnson & Johnson* and *Klosowski*. (*See* June 17, 2026, Order 6 ("The Court finds the reasoning from the Third Circuit and *Klosowski* persuasive. While Plaintiffs point to studies that allegedly undermine the marketing claims made by Defendants, they make no allegations that they suffered any injury because of the alleged false advertising beyond simply purchasing PGT-A testing.").)

[] Plaintiffs allege, for example, that they failed to become pregnant, suffered a miscarriage, or experienced a medically compromised pregnancy—notwithstanding [Defendants'] alleged marketing statements that PGT-A mitigates all of those problems." *Klosowski*, 2025 WL 2532500, at *3. Rather, Plaintiffs repeatedly allege that they would not have purchased Defendants' PGT-A testing had they known that the testing and its results were inaccurate and unreliable. (*See e.g.*, Compl. ¶¶ 31, 71, 213, 303.) It is unclear, however, whether Plaintiffs' results were indeed inaccurate. Plaintiffs allege that the consent forms they signed during the purchase process indicated that Defendants' "testing has a diagnostic accuracy of 98% to 99%" (*id.* ¶¶ 309, 316, 323), and Plaintiffs' results each indicated a diagnostic accuracy of 98.6% (*id.* ¶¶ 311, 318, 325). Given these rates fall squarely within the margin of the stated accuracy rate, without more, the Court has no grounds to infer that Defendants deprived Plaintiffs of the benefit of their bargains such that Plaintiffs have asserted an injury-in-fact.[8]

Plaintiffs' allegations, therefore, are not sufficient to establish Article III standing under a benefit of the bargain theory of economic harm. *See, e.g.*, *In re Plum Baby Food*, 637 F. Supp. 3d at 223-25 (finding plaintiffs did not have Article III standing where they claimed a presence of heavy metals in baby food and alleged that "they did not receive the benefit of the bargain because they believed they were buying 'healthy, nutritious' baby food products" because the complaint lacked "factual support of adverse health consequences or plausible allegations of future risk[s]"); *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010) (finding plaintiff lacked

---

[8] Plaintiffs' Reply Brief argues that Defendants "ignore[d] Plaintiffs' specific allegations of injury in fact," citing Paragraphs 268-81 as those "alleging particularized injuries." (Pls.' Opp'n Br. 8, ECF No. 28.) The Court's review of these paragraphs, however, reveals that they only contain allegations regarding the inaccuracies of Defendants' advertising claims. (*See* Compl. ¶¶ 268-81.) The Court notes that Plaintiffs are correct that they need not "*prove* a specific injury" (Pls.' Opp'n Br. 8 (emphasis added)), but to survive a motion to dismiss, Plaintiffs must at least *allege* some cognizable injury. *Johnson & Johnson*, 903 F.3d at 281. They have not.

an injury-in-fact to confer standing where plaintiff asserted "a subjective allegation that . . . trace amounts of lead in . . . lipsticks are unacceptable" but conceded that plaintiff "ha[d] suffered no adverse health effects from using the lipsticks"); *James v. Johnson & Johnson Consumer Cos.*, No. 10-3049, 2011 WL 198026, at *2 (D.N.J. Jan. 20, 2011) (rejecting plaintiffs' benefit of the bargain theory related to shampoo that contained methyl chloride because "[p]laintiffs received the benefit of their bargain so long as there were no adverse health consequences, and the product worked as intended").[9]

While this Court must accept as true Plaintiffs' allegations that they would not have purchased PGT-A testing absent Defendants' misrepresentations and omissions (*see* Compl. ¶¶ 312, 319, 326), the Court cannot read nonexistent allegations into the Complaint to confer standing.[10]

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is granted. Plaintiffs will be afforded an opportunity to file an amended complaint to address the deficiencies identified herein. The Court will issue an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: October 8, 2026

[9] Defendants also argue that Plaintiffs lack standing to assert claims outside their home states. (Defs.' Moving Br. 10-12.) Because the Court finds that Plaintiffs have no standing to assert any claims due to the Complaint's failure to allege an injury-in-fact, the Court need not reach this argument or Defendants' remaining arguments.

[10] *See In re U.S. Vision Data Breach Litig.*, 732 F. Supp. 3d 369, 378 (D.N.J. 2024) ("[T]hough the Court must assume that [p]laintiffs' factual allegations are true, it is under 'no obligation to consider conclusory or nonexistent allegations.'" (citation omitted)); *see also Finkelman v. Nat'l Football League*, 810 F.3d at 194 ("Insofar as we construe the complaint to allege that [plaintiff] paid more for his [product] than he would have absent [defendant's] alleged misconduct, that contention is a 'bald assertion' unsupported by well-pleaded facts.").